**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KELLY EXCELLUS,<br><br>Plaintiff,<br><br>v.<br><br>EMBRAER, S.A., EMBRAER CUSTOMER SERVICES, INC., and EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC,<br><br>Defendants. | No. 1:21-cv-11779-JEK |

**MEMORANDUM AND ORDER ON EMBRAER, S.A. AND EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**

**KOBICK, J.**

Plaintiff Kelly Excellus was working as a flight attendant in July 2018 when a plane's recirculation fan failed, causing a strong chemical odor to enter the cabin. Ever since her exposure to those fumes, she has experienced debilitating symptoms, including chronic migraines and blurred vision. Excellus brought this lawsuit three years later against the aircraft's manufacturer, Embraer, S.A., and other defendants, alleging that they failed to adequately warn crew members about the dangers of recirculation fan failures and how to respond to such failures. Following discovery, two of the remaining defendants—Embraer Aircraft Customer Services, LLC ("EACS") and Embraer, S.A.—moved for summary judgment and to exclude testimony from four of Excellus' experts.

The motion to exclude the causation testimony of Excellus' treating physicians, Drs. Robert Kaniecki and Robert Harrison, and her expert, Dr. C. Vyvyan Howard, will be denied because any concerns about such testimony go to weight, not admissibility. The motion to exclude

the testimony of Excellus' liability expert, Judith Anderson, will be granted in part and denied in part. Anderson may testify that the plane's manufacturer could have anticipated, and failed to adequately warn crew members about, the dangers of recirculation fan failures, but she may not testify about any alleged design deficiencies or proposed alternative designs of the aircraft. Finally, the motion for summary judgment will be granted in part and denied in part. Defendants EACS and Embraer Customer Services, Inc. ("ECS") are, as Excellus concedes, entitled to summary judgment. But defendant Embraer, S.A. ("Embraer") is not, because a reasonable jury could conclude from the record evidence that Embraer knew or should have known that recirculation fan failures can be harmful to human health and thus had a duty to warn of such dangers; its existing warning was inadequate; and its failure to properly warn Excellus caused her injuries.

## BACKGROUND

The following facts, unless otherwise noted, are either undisputed or recounted in the light most favorable to Excellus, as the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 455 (1st Cir. 2023).

### I. Factual Background.

On July 31, 2018, Excellus was a flight attendant for JetBlue Airways assigned to work on a flight from Boston to Chicago alongside fellow flight attendant Michael DiMasi, First Officer Eden Siff, and Captain Troy Ferragamo. ECF 108, ¶¶ 11-12. JetBlue's ERJ 190-100 IGW ("E-190") aircraft was designed and manufactured by Embraer, a Brazilian company. *Id.* ¶ 1. The Federal Aviation Administration ("FAA") has certified that aircraft for airworthiness since 2005. *Id.* ¶¶ 4, 99-100. EACS was not involved in designing or manufacturing the E-190 plane. *Id.* ¶ 3.

At around 4:00 p.m., Excellus boarded the plane while it was parked at the gate and began eating her lunch in the rear cabin. *Id.* ¶¶ 11, 13; ECF 113, ¶ 125. The other crew members later

boarded the aircraft. ECF 108, ¶¶ 13-15. Shortly after Ferragamo and Siff started the Aircraft's auxiliary power unit, a strong "chemical smell" entered the cabin. *Id.* ¶ 16; ECF 113, ¶¶ 119, 123. When DiMasi went to back of the plane to introduce himself to Excellus, he noticed the smell. ECF 108, ¶ 17. That smell was, in Excellus' recollection, strongest in the rear cabin. ECF 113, ¶ 120. One minute later, DiMasi informed the cockpit of the odor. ECF 108, ¶ 18. Ferragamo and Siff had already detected the odor, which Ferragamo described as an "adhesive" "glue smell" that was "very" much "out of the norm." ECF 113, ¶¶ 121-22.

Approximately ten minutes later, Excellus and DiMasi exited the plane through the still-open left forward door, and they were followed shortly thereafter by Ferragamo and Siff. ECF 108, ¶¶ 19-20. Excellus and DiMasi remained on the jet bridge for another five minutes or so smelling the same odor. *Id.* ¶ 19. After deplaning, the crew members experienced similar symptoms with different levels of severity. ECF 113, ¶ 124. Excellus felt queasy, loopy, and like she was walking on clouds; had dry eyes; and experienced a tingling sensation in her hands. ECF 108, ¶ 22. DiMasi had a headache; was nauseous, dizzy, and unsteady on his feet; and "felt like [his] head was in a vacuum." *Id.* ¶ 23; ECF 113, ¶ 124. Ferragamo and Siff similarly experienced dizziness and headaches. ECF 108, ¶¶ 24-25; ECF 113, ¶ 124. Once out of the plane, Ferragamo called MedAire, a third-party medical service. ECF 108, ¶ 21. MedAire determined, after a phone consultation with Ferragamo, that all four crew members were unfit to fly. *Id.* ¶ 50(b).

Excellus and DiMasi were then transported to Massachusetts General Hospital ("MGH") for evaluation. *Id.* ¶ 27. Nearly five hours after the initial exposure, at around at 9:00 p.m., MGH providers tested Excellus' level of carboxyhemoglobin—a compound that forms when carbon monoxide binds to hemoglobin, impairing the blood's ability to transport oxygen—and found that

she still had an elevated level of 3.2%. ECF 113, ¶¶ 126, 128. That level is above the reference range of 0% to 1.5%. *Id.* ¶ 127.

Meanwhile, JetBlue maintenance staff cleared the plane's cabin air and deactivated the left and right recirculation fans. ECF 108, ¶ 44; ECF 113, ¶ 130. Those fans recirculate cabin air throughout the plane. ECF 113, ¶¶ 117-18. Four days later, on August 4, 2018, JetBlue replaced the aircraft's left recirculation fan. *Id.* ¶ 131; ECF 108, ¶ 47. Collins Aerospace, which manufactures the E-190's recirculation fans, examined that fan and determined that its parts—the stator, rotor, and bearings—had burnt and melted varnish. ECF 108, ¶¶ 48-49; ECF 113, ¶ 133.

It is undisputed that the failed left recirculation fan caused the malodorous fumes on July 31, 2018. ECF 108, ¶ 52. Before this lawsuit, Embraer had never received a claim of an individual having been injured by a failed recirculation fan. *Id.* ¶ 107. In an internal bulletin that postdated Excellus' exposure event, from February and April 2021, Embraer reported that "[t]here have been occurrences of recirculation fan failure affecting operators, often followed . . . by reports of acid smell in cabin/cockpit." ECF 113, ¶ 135.

Since the July 2018 incident, Excellus has experienced chronic migraines, blurred vision, light sensitivity, and an inability to concentrate, regulate her mood, or maintain her balance. ECF 108, ¶¶ 31-32. She also needs to wear prescription glasses and sunglasses after not previously having a prescription. *Id.* ¶ 32. Doctors have diagnosed Excellus with various conditions over the years to account for these symptoms. For example, Dr. Robert Kaniecki diagnosed her in January 2020 with "chronic posttraumatic headaches with toxic encephalopathy." *Id.* ¶ 34; ECF 113, ¶ 145. Dr. Yoon Cho opined in August 2022 that Excellus "likely had migraine with aura plus overuse analgesic headaches," which "might have been potentially triggered by some exposure." ECF 108, ¶ 36. Dr. Robert Harrison concluded in March 2024 that Excellus' symptoms were "consistent

with brain injury" and her "health problems were caused by exposure to volatile organic compounds with carbon monoxide." *Id.* ¶¶ 37-38; *see* ECF 113, ¶ 144.

The parties contest whether crew members like Excellus were adequately warned about the dangers of recirculation fan failures and how to respond to those dangers. Embraer's airplane flight manual instructs crew members in the case of "SMOKE FIRE OR FUMES" to first "DON" "Crew Oxygen Masks" and "ESTABLISH" "Crew Communication." ECF 97-29, § 4-30, at 4; *see* ECF 108, ¶¶ 112-13. Those steps are "recall items," meaning that they must be performed quickly and from memory. ECF 108, ¶ 113. Embraer's E-190 flight attendant manual also describes, locates, and explains how to use emergency equipment, including oxygen and Personal Breathing Equipment. *Id.* ¶ 114. The manual addresses in-flight procedures and instructs, in the event of "SMOKE FIRE OR FUMES": "LAND AT THE NEAREST AIRPORT." ECF 97-29, § 4-30, at 3-4, 7; *see* ECF 108, ¶ 111.

## II. **Procedural History.**

Excellus filed this action in July 2021 against Embraer, EACS, ECS, Embraer Aircraft Holding, Inc. ("EAH"), and Embraer Executive Jet Services, LLC ("EEJS") in Suffolk Superior Court. ECF 11, at 1-4. The complaint asserts separate claims for negligence (Counts I, III, V, VII, and IX) and breach of express and implied warranties of merchantability (Counts II, IV, VI, VIII, X) against each defendant. *Id.* at 11-19, ¶¶ 47-101. Invoking diversity jurisdiction, Embraer, EACS, and EEJS removed the case to this Court in November 2021. ECF 1, ¶¶ 5-8.[1]

[1] The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, as the complaint demanded $1.75 million. *See* ECF 11, at 21 (civil action cover sheet). There is also complete diversity of citizenship because Excellus is a citizen of Massachusetts, where she resides, and none of the defendants are citizens of the Commonwealth. *Id.* at 3, ¶ 1; ECF 1, ¶ 6.

That same month, EAH, EACS, and EEJS each filed an answer. ECF 12, 13, 14. The action was stayed in August 2022 to permit Excellus to serve Embraer through the Hague Convention. ECF 27. Embraer answered the complaint in June 2023. ECF 32. The claims against EAH and EEJS (Counts VII, VIII, IX, and X) were dismissed in October 2024. ECF 55. Embraer and EACS have represented, and Excellus has acknowledged, that ECS does not exist. ECF 59, at 1 n.1; ECF 61, at 1.

In February 2026, after completing discovery, Embraer and EACS moved for summary judgment and filed two motions to exclude expert testimony. ECF 95, 98, 99. Excellus opposed the motions and those defendants filed reply briefs. ECF 106, 107, 112, 114, 115. The Court held a hearing and took the three motions under advisement in June 2026. ECF 122. At that hearing, Excellus agreed that EACS and ECS were entitled to summary judgment. She also confirmed at the hearing that she is not pursuing a design defect claim. The sole theory for liability now advanced by Excellus is that the E-190 aircraft was unreasonably dangerous or defective because, as alleged in her complaint, Embraer "failed to properly warn and/or instruct the users of the aircraft of hazards associated with exposure to contaminated cabin air and how those risks could be lessened." ECF 11, at 11, 15, ¶¶ 51, 73.

**MOTIONS TO EXCLUDE EXPERT TESTIMONY**

The Court begins with the motions to exclude four of Excellus' experts. Federal Rule of Evidence 702 governs the admissibility of expert opinion evidence. It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under the rule, "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of" admissibility, not weight. Fed. R. Evid. 702, Adv. Comm. Notes 2023 Amendment.

Consistent with Rule 702, the Supreme Court's seminal decision in "*Daubert* establishes that before admitting expert testimony, the trial court must fulfill its 'gatekeeping role' by making an independent determination that the expert's proffered scientific knowledge is both reliable and relevant." *United States v. Phillipos*, 849 F.3d 464, 470 (1st Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The "'focus' of the inquiry into the admissibility of expert testimony under Rule 702 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Rodríguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (quoting *Daubert*, 509 U.S. at 595). "This distinction means that when the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony and thus a question to be resolved by the jury." *Id.* (citation modified). "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "*Daubert* made clear that to be admissible under Rule 702, an expert's opinion 'must be supported by appropriate validation' and rest on 'more than subjective belief or unsupported speculation.'" *Rodríguez*, 91 F.4th at 70 (quoting *Daubert*, 509 U.S. at 590).

**I. <u>Drs. Robert Kaniecki and Robert Harrison.</u>**

Embraer first moves to bar Excellus' treating physicians, Drs. Robert Kaniecki and Robert Harrison, from providing expert testimony on causation at trial.[2] In her expert disclosures, Excellus identified those physicians as "quasi-expert witness[es]" who would testify about, among other things, "the causal connection between [her] medical conditions and the fume event(s) subject of this litigation." ECF 97-27, at 3-4. Embraer does not dispute that Drs. Kaniecki and Harrison are qualified as experts, but it contends that their opinions on causation are unreliable and thus subject to exclusion.

Drs. Kaniecki and Harrison's proposed testimony on causation constitutes expert opinion. "Opinions offered by treating physicians often straddle the line between lay and expert testimony because treating physicians 'are percipient witnesses who also possess specialized knowledge.'" *Friedman v. Cent. Maine Power Co.*, 174 F.4th 233, 242 (1st Cir. 2026) (quoting *United States v. Betro*, 115 F.4th 429, 450 (6th Cir. 2024)). Treating physicians must be qualified as experts when they go beyond "their first-hand observations and treatment of a patient" by, for example, "hypothesizing about the cause or nature of an illness." *Id.* (citation modified); *see Gómez v. Rivera Rodríguez*, 344 F.3d 103, 113 (1st Cir. 2003) ("By and large, courts have . . . ruled that a treating physician, testifying as to his consultation with or treatment of a patient, is not an expert witness[.]"). Here, rather than simply opine on Excellus' symptoms and treatment based on their personal observations, Drs. Kaniecki and Harrison both opine on the cause of her condition. For example, Dr. Kaniecki diagnosed Excellus as having "chronic posttraumatic headaches with toxic encephalopathy" caused by exposure to "[s]ome type of toxin that was aerosolized" on her plane.

---

[2] Given Excellus' concession that EACS is entitled to summary judgment, the Court now treats EACS and Embraer's motions and arguments as being advanced by only Embraer.

ECF 108, ¶¶ 34-35. Dr. Harrison likewise testified that Excellus' "health problems were caused by exposure to volatile organic compounds with carbon monoxide." *Id.* ¶ 38. Because their opinions rely on "specialized knowledge" about the cause of Excellus' symptoms, Drs. Kaniecki and Harrison must be qualified as experts. Fed. Rs. Evid. 701, 702; *see Friedman*, 174 F.4th at 243 (treating physician who "'testifie[d] that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical . . . must be qualified under Rule 702'" (quoting Stephen A. Saltzburg et al., 3 *Federal Rules of Evidence Manual* § 701.02[7] (Matthew Bender 12th ed. 2019))).

Dr. Kaniecki may testify that Excellus' condition was caused by exposure to an aerosolized toxin. His opinion on this point is not, as Embraer argues, the product of the logical fallacy of *post hoc ergo propter hoc*, which "'literally means after this, because of this' and . . . is 'called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.'" *In re Neurontin Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 04-cv-10981-PBS, 2009 WL 3756328, at *8 (D. Mass. Aug. 14, 2009) (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005)). In Embraer's telling, Dr. Kaniecki diagnosed Excellus based on only her reporting symptoms after the 2018 incident, and he failed to review any studies or identify what toxin, if any, may have caused her condition. But Dr. Kaniecki did not rely solely on Excellus' self-reports. Board-certified in neurology and headache medicine, he had already "seen roughly 50 people" with chronic posttraumatic headaches, including "flight attendants or pilots who had been potentially exposed to aerosolized toxins," over the course of his time at Allegheny Health Network and as the founder and director of University of Pittsburgh's Headache Center. ECF 97-11, at 9:6-10:10, 23:18-24. Nor is a failure to examine "peer-reviewed studies in his causation diagnosis . . . a determinative factor" in assessing admissibility. *Granfield v. CSX*

*Transp., Inc.*, 597 F.3d 474, 486 (1st Cir. 2010). While Dr. Kaniecki had not "reviewed any studies in making [his] diagnosis or treatment recommendations to . . . Excellus" specifically, he testified to being "aware of the studies that have shown" toxins, such as carbon monoxide, "get[ting] into the ventilatory system" and causing her condition. ECF 97-11, at 24:8-17, 46:4-6. He also need not know which precise toxin caused that condition because, as Excellus points out, he will testify merely that toxic exposure caused her injury. *See Allen v. Martin Surfacing*, 263 F.R.D. 47, 54, 57 (D. Mass. 2009) (denying motion to exclude where expert "was unable to determine whether [plaintiff's] exposure to any *particular* chemical exceeded guideline exposure limits," because that objection went to weight rather than admissibility). Since Dr. Kaniecki "was called upon only to offer a routine diagnosis, on a patient he had examined, pertaining to a common condition well within his particular expertise," his "training and experience plac[e] his . . . testimony well above the Rule 702/*Daubert* bar." *Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir. 2006).

Dr. Harrison, for his part, may testify that Excellus' symptoms were caused by exposure to volatile organic compounds and carbon monoxide. He testified that, as a doctor at the University of California at San Francisco over the past 25 years, he has treated "[p]robably over a hundred" flight attendants who "have been . . . injured or suspected to have been injured by exposure to contaminated cabin air." ECF 97-14, at 12:23-24, 50:24-51:5. He further testified that Excellus' presentation was "consistent with the hundred-or-so other flight attendants [he had] treated who ha[d] . . . become ill due to exposure to contaminated cabin air." *Id.* at 51:22-52:1. Embraer takes issue with Dr. Harrison's failure to strictly adhere to what he himself had identified as "the best practice and the accepted methodology for determining whether somebody's chemical exposure caused their problem." *Id.* at 54:8-10. But he mostly followed his prescribed six-step "standard methodology" in diagnosing Excellus with "[c]hronic nonintractable headache" after determining

that she was exposed to "probably neurotoxic" chemicals that entered her body through the air on the plane and caused her symptoms. *Id.* at 53:1-4, 54:20-58:3; ECF 97-13, at 3-4. His failure to identify the specific chemical that caused Excellus' injuries, assess the duration and dose of that chemical, or expressly perform a differential diagnosis to rule out other diagnoses goes to "the weight and credibility of the testimony," not to its admissibility. *Rodríguez*, 91 F.4th at 71 (quotation marks omitted). Since Dr. Harrison would testify that toxic exposure caused Excellus' injury, he, like Dr. Kaniecki, need not know which specific chemical is the cause. Dr. Harrison is qualified as an expert under Rule 702 because his proposed causation testimony resulted from his examination of Excellus for toxic exposure, a specialty he has developed after seeing a hundred or so similar flight attendants. *See Feliciano-Hill*, 439 F.3d at 25.

## II. <u>**Dr. C. Vyvyan Howard.**</u>

Embraer next moves to exclude the testimony of Excellus' retained expert, Dr. C. Vyvyan Howard. Excellus' expert disclosures identified Dr. Howard as a "toxicopathologist specializing in the problems associated with the action of toxic substances on human health." ECF 97-27, at 2. Currently an Emeritus Professor of Bioimaging at the University of Ulster, Dr. Howard has published more than 140 peer-reviewed scientific papers, principally in the field of quantitative toxicology. ECF 97-15, at 28-30. His expert report in this case concludes that Excellus' symptoms were caused by "an acute exposure to carbon monoxide when a recirculation fan malfunctioned on the aircraft she was working on." *Id.* at 350-51. More specifically, he determined that "Excellus suffered an acute exposure to carbon monoxide (at ~50 [parts per million]) for a period of between 10 and 15 minutes, leading to an estimated carboxyhaemoglobin level of more than 6%, where the risk of subsequent long term sequalae is encountered." *Id.* at 420-22.

As Embraer sees it, Dr. Howard's report is unreliable for two principal reasons. First, Embraer contends that his "'back-calculat[ion]'" of Excellus' carboxyhemoglobin level at the time of the incident as approximately "6.4% (in the range of 6 to 7%)" is incorrect. *Id.* at 278-79, 358. Dr. Howard arrived at 6.4% by taking the carboxyhemoglobin level that was recorded for Excellus at MGH approximately 300 minutes after the event—3.2%—and doubling it because carboxyhemoglobin has a half-life of roughly 320 minutes. *Id.* at 354-57. He acknowledged at his deposition, however, that "the normal carboxyhemoglobin level" for nonsmokers like Excellus can range from 0% to 3%. ECF 97-25, at 52:9-23. In Embraer's view, his calculation must therefore be excluded as unreliable because he never determined Excellus' baseline carboxyhemoglobin level or subtracted that level from the 3.2% level she produced at MGH.

This objection to "the factual underpinnings of an expert's" report goes to "the weight of the proffered testimony, not to its admissibility." *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007); *accord Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011). Embraer does not dispute that Dr. Howard's back-calculation method is generally reliable. Instead, it disputes his application of that method in this case, taking issue with his failure to calculate a baseline carboxyhemoglobin level to inform his conclusions. *See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (*Daubert* and Rule 702 "deman[d] only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion"). But Embraer's insistence that Excellus' baseline carboxyhemoglobin level could have been as high as 3% is inconsistent with other evidence in this case—including, for example, the MGH records, which indicate that the reference range for carboxyhemoglobin levels is 0% to 1.5%. ECF 113, ¶ 127. Further, Dr. Howard's conclusion that Excellus suffered from acute exposure to carbon monoxide was not

based solely on his application of the back-calculation method. His report also lists the acute and chronic symptoms of carbon monoxide exposure and then opines that "the acute and chronic symptoms that Ms. Excellus has described are consistent with the carbon monoxide poisoning under consideration in this case." ECF 97-15, at 329-45, 425-38. The accuracy of Dr. Howard's back calculation of Excellus' carboxyhemoglobin level, and the conclusions he draws from that level, are proper matters for cross-examination, not for wholesale exclusion.

Embraer also argues that Dr. Howard's conclusion—that Excellus' 6.4% carboxyhemoglobin level is probative of the carbon monoxide exposure that caused her symptoms—is not supported by the data he cites.[3] Dr. Howard's report observes that greater than 6% is "a significant level according to the literature," and it then cites a May 2022 article titled "Carbon Monoxide: Toxicological Overview." ECF 97-15, at 439, 451-52. Per that article, "[n]o significant adverse health effects have been reliably demonstrated in the literature where carbon monoxide exposure resulted in carboxyhaemoglobin levels of below 6% in healthy individuals." *Id.* at 453-55 (italics omitted). Dr. Howard's report then explains that "Excellus was not a healthy individual" because "she had a microcytic anaemia at the time of the incident, a known cause of increased vulnerability to the effects of carbon monoxide," and "she experienced a carboxyhaemoglobin level in excess of 6%." *Id.* at 440-41, 455-57. The article also states, as Embraer notes, that "'[s]tudies have demonstrated that brain tissue metabolism remains constant up to carboxyhaemoglobin levels of 20%, suggesting hypoxia does not occur at [carbon monoxide]

[3] Relatedly, Embraer asserts that Dr. Howard's opinion is inconsistent with other expert opinions. For example, Dr. Stefano Kales was unable to confirm that Excellus suffered "an acute overexposure to carbon monoxide" based on her reported carboxyhemoglobin level of 3.2% at MGH. ECF 108, ¶ 33. Dr. Harrison also opined that Excellus' "health problems were caused by exposure to volatile organic compounds with carbon monoxide" and would thus "not attribute her symptoms solely to carbon monoxide." *Id.* ¶¶ 38-39. But the "mere fact that two experts disagree is not grounds for excluding one's testimony." *Feliciano-Hill*, 439 F.3d at 25.

lower levels.'" ECF 102, at 10 (citation omitted). The possible internal discrepancy within the article between the 6% and 20% figures is not, however, a reason to exclude Dr. Howard's testimony. That Embraer may be "able to undercut some of the research basis for" his opinion affects "the weight and credibility," but not "the admissibility," of that opinion. *Payton v. Abbott Labs*, 780 F.2d 147, 156 (1st Cir. 1985). Since one figure may support and the other may undermine his opinion, those percentages are likewise ripe for "[v]igorous cross-examination" at trial. *Daubert*, 509 U.S. at 596. Accordingly, Dr. Howard's causation opinion will not be excluded.

**III. <u>Judith Anderson.</u>**

Embraer finally moves to exclude the testimony of Excellus' liability expert, Judith Anderson. A certified Industrial Hygienist since 1999, Anderson works at the Air Safety, Health, and Security Department for the Association of Flight Attendants-CWA, AFL-CIO, where she researches "airborne contaminants in the aircraft cabin, including fan failures." ECF 97-2, at v; *see* ECF 106-1 (her CV). As a member on an engineering committee at SAE Aerospace, she also helped draft a "report about the types of chemical contaminants that are generated when there is an electrical failure and when there is a fan failure." ECF 97-18, 32:4-9. In her expert report, Anderson opines that Embraer "should have anticipated that a recirculation fan would fail within the service life of an aircraft unless it was systematically inspected and replaced prior to failure." ECF 97-2, at 11-1, ¶ 2 (emphasis omitted). She also concludes that Embraer "knows and/or should know that recirculation fan failures can cause crew and passengers to be exposed to toxic electrical fumes in the cabin air due to a combination of factors," but it "chose not to . . . provide warnings." *Id.* at 12-1, ¶¶ 4-5.

Embraer challenges these opinions on two grounds. First, in Embraer's telling, Anderson's conclusion that a recirculation fan failure poses a risk to human health is not supported by a reliable

methodology. That is so, Embraer contends, because Anderson merely assumes that such a failure *could* release toxic fumes without examining the recirculation fan at issue in this case to determine which fumes are necessarily emitted. Her failure to personally test the fan, however, does not render her opinion unreliable. *See Daubert*, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). Since Embraer "did not produce information on the electrical wire, insulation, and other components in the recirculation fan," Anderson explains in her report, she had "to describe the chemical compounds that could have been present" at the time of the incident. ECF 97-2, at 6-4 & 6-5. She deemed the available documentation, including Collins Aerospace's tests of the fan and the crew members' reported symptoms, "sufficient" to support her opinions, particularly where "there were no sensor data to definitively show what the chemical contaminants were." ECF 97-18, at 37:7-25, 39:1-16, 47:21-48:9, 129:2-130:14.

Anderson provides "[e]xamples of hazardous chemicals reported in electrical fumes and their potential health impacts" in her report. ECF 97-2, at FT-1 (Table 6-2). She also testified that "there is enough literature on the contents of electrical fumes from this type of [fan] failure that . . . it is fair to characterize these fumes as harmful or hazardous," especially given that "all four crew members reported symptoms, the aircraft was taken out of service, [and] the pilots didn't fly for the rest of the day." ECF 97-18, at 131:18-132:7. Such literature includes publications by the Department of Transportation in 1978 and the FAA in 2025, as well as reports that she co-authored regarding "the chemical contaminants that are generated when fan failures or electrical faults occur." *Id.* at 34:5-8, 36:7-17, 39:17-40:25. The 1978 article, which Embraer highlights, found that fourteen wire insulation products "were not equally toxic" by calculating "the average time it took for a group of nine rats to die." ECF 97-2, at 6-6. From Embraer's perspective, Anderson fails to

link those products to the recirculation fan or explain how a rat's response would be comparable to a human's. But Anderson clarified at her deposition that the materials used then were "essentially the same" as they are now. ECF 97-18, at 39:23-40:6. She also explained that while "rats aren't the same as humans," the study provided "a measure to rank the toxicity of thermal degradation products from various types of wire insulation" on humans. *Id.* at 134:10-21. Embraer's criticisms about the strength of Anderson's sources again "speak to the probative weight of the testimony, not to its admissibility." *Martínez v. United States*, 33 F.4th 20, 33 (1st Cir. 2022).

Embraer additionally argues that Anderson has no basis to conclude that it should have known and warned of any such risk to human health. Anderson opines that Embraer should have had such knowledge because (1) "[r]ecirculation fans have an estimated service life of 15,000 hours compared to a regional aircraft estimated service life of 60,000 hours"; (2) fan failures were "the third-most widely reported source of smoke and fumes by US operators" "[o]ver a 14-year period"; and (3) Embraer "has received and continues to receive fan failure reports from its operators." ECF 97-2, at 11-1, ¶ 2. Embraer does not dispute the first proposition—i.e., that it "could anticipate that a recirculation fan would need to be replaced at least three times during the life of the aircraft," *id.* at 7-3, and that the fan would "either fail, produce fumes and perhaps smoke, and be replaced" or "be replaced . . . prior to failure," *id.* at 6-3. Instead, it contests the accuracy of the second and third propositions. But Anderson need not, as Embraer asserts, have personally reviewed any of the dozens of pilot reports identifying a recirculation fan issue. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 790 (7th Cir. 2000) ("[A]n expert is not always required to personally perceive the subject of his analysis."). Nor is "the third most common source" statistic rendered unreliable because Anderson does not identify which of the more than a thousand service difficulty reports occurred in the aircraft at issue or indicate whether those reports

involved an injury to a crew member. ECF 97-2, at 6-2; *see* ECF 97-18, at 30:3-31:9. While "not limited to E-190 aircraft and Collins Aerospace fans," Anderson concedes, "the data illustrate that fan failures can be anticipated and that they occur." ECF 97-2, at 9-2. Anderson opines that recirculation fan failures caused 8.5% of reported smoke or fume events from 2002 to 2011 and 6.1% of such events between 2018-2019 and 2022-2023. ECF 108, ¶¶ 85-86. Embraer's qualms about the data relied upon by Anderson are appropriately resolved at trial through "the adversary process" with "active cross-examination." *Ruiz-Troche*, 161 F.3d at 85.

Anderson further opines that Embraer could have provided warnings in its manuals to ensure that cabin crew knew how "to recognize and respond to different types of smoke/fumes including from recirculation fans, including the use of personal protective equipment." ECF 97-2, at 11-2 (italics omitted). Embraer argues that this opinion is undermined by its airplane flight manual, which instructs crew members in the case of "SMOKE FIRE OR FUMES" to "DON" "Crew Oxygen Masks." ECF 97-29, § 4-30, at 4. In her report, however, Anderson clarifies that "suitable educational materials and standard procedures for crewmembers to recognize and respond to different types of onboard fumes and smoke . . . would be additional to the basic smoke/fire procedures in which crewmembers are already trained." ECF 97-2, at 6-10. As Anderson notes, Embraer "did not produce any" such "additional" materials. *Id.* at 10-5. She also testified that despite being trained by JetBlue to respond to "fume events," Excellus "didn't know what to do" because, unlike in those events where oil or hydraulic fluid are present in the cabin air, the plane "didn't smell like oil or hydraulic fumes." ECF 97-18, at 152:1-19.

Accordingly, Anderson's testimony that Embraer should have known and warned of the dangers of recirculation fan failures rests on a reliable foundation and will not be excluded. Such testimony—that Embraer could have anticipated such fan failures but did not provide flight

attendants adequate warnings about the attendant dangers—supports what Excellus described at the motion hearing as her "stronger" and "pure" failure to warn theory, which will be discussed in the summary judgment section. *See Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 422 (2013) ("A product may be defective and unreasonably dangerous because of . . . a failure reasonably to warn of the product's foreseeable risks of harm.").

Separately, Anderson's report also opines that (1) the "*design* of the E-190 air supply system poses an unreasonable risk of harm to crewmembers because the recirculation fans will fail"; (2) "Embraer does not utilize readily available and inexpensive technology to warn crew members when the air supplied to the aircraft cabin contains carbon monoxide and other compounds in electrical fumes"; and (3) "Embraer's *design* of the E-190 flight deck alert system introduces a delay of at least 60 seconds before the pilots can confirm that a recirculation fan has failed, prolonging the onboard exposure to fumes." ECF 97-2, at 12-1, ¶¶ 3, 5 (emphases added). Embraer seeks to exclude these opinions because Anderson is not qualified to testify about the design of recirculation fans or alternative designs to the fan at issue in this case. Excellus asserts in her opposition to the motion that Anderson "does not offer engineering design opinions," but maintains that Anderson should nonetheless be allowed to testify about, among other things, Embraer's lack of "preventative maintenance" and "carbon monoxide detection technology." ECF 106, at 1, 8. At the motion hearing, Excellus clarified that these additional opinions support her "weaker" failure to warn theory, which posits that Embraer failed to use preventative technology or alternative recirculation fan designs that could have warned crew members prior to fan failure.

Excellus' secondary failure to warn theory finds no foothold in Massachusetts law. That Embraer could have employed technology, like carbon monoxide detectors, on its plane to warn crew members of a recirculation fan failure has no bearing on whether "foreseeable users" were

"adequately warned of dangers associated with [the fan's] use" ahead of time. *Evans*, 465 Mass. at 439 (quotation marks omitted). Rather, the availability of such technology bears on a claim of design defect. To sustain such a claim, which Excellus does not advance here, she "must prove that a reasonable alternative design was, or reasonably could have been, available at time of sale or distribution, that would have reduced the foreseeable risks of harm posed by the product at reasonable cost, and that the failure to adopt the safer alternative was unreasonable." *Id.* at 424 (quotation marks omitted). But neither Anderson nor any of Excellus' other experts testifies to those elements. *See Christensen v. Thornton*, 83 Mass. App. Ct. 1133 (2013) (Rule 1:28 decision) (plaintiff's "failure to proffer an expert to substantiate his design defect theory" that a "fan was an unreasonably dangerous product" was "fatal" to his design defect claim); *Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 69 (D. Mass. 2000) (excluding testimony from industrial hygienist where his "ultimate conclusion that [plaintiff] was exposed to a toxic event because of a supposed design defect . . . rest[ed] on unverified assumptions, speculation and guesswork"). Likewise, that Embraer could have adopted preventative maintenance protocols for replacing recirculation fans before they malfunctioned does not bear on a failure to warn claim. No warning to crew members is involved in establishing such protocols. Nor is there evidence that Embraer was told by the manufacturer of the recirculation fan, Collins Aerospace, that its fans should be replaced at certain intervals. And this case, as Excellus represents, "is not a product engineering case based on design principles," but "an environmental safety case based on a manufacturer's failure to warn and instruct about known dangerous conditions." ECF 110, at 3.

In sum, Anderson may not testify about any alleged design deficiencies in or proposed alternative designs for the E-190 aircraft. But, as discussed, she may opine that Embraer could

have anticipated, and failed to adequately warn flight crew members about, the dangers of the recirculation fan.

**MOTION FOR SUMMARY JUDGMENT**

The Court now turns to Embraer's summary judgment motion. Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, Embraer must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). The Court "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to" Excellus, but "need not credit conclusory allegations, improbable inferences, and unsupported speculation." *Dixon-Tribou*, 86 F.4th at 458 (quotation marks omitted). Excellus may not simply "rest upon mere allegation or denials," but instead "must present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

Excellus' claims for negligence and breach of express and implied warranties of merchantability both advance a failure to warn theory of liability. In Massachusetts, those claims "converg[e]" and are "judged by the same standard: the reasonableness of the defendant's actions in the circumstances." *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 637 (2001); *accord Carrel v. Nat'l Cord & Braid Corp.*, 447 Mass. 431, 441 n.12 (2006). A product may be defective

"'if foreseeable users are not adequately warned of dangers associated with its use.'" *Evans*, 465 Mass. at 439 (quoting *Hayes v. Ariens Co.*, 391 Mass. 407, 413 (1984)). A manufacturer thus generally "has a duty to warn foreseeable users of dangers in the use of that product of which he knows or should have known." *Mitchell v. Sky Climber, Inc.*, 396 Mass. 629, 631 (1986). The warning must be "'comprehensible to the average user and . . . conve[y] a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.'" *Rafferty v. Merck & Co.*, 479 Mass. 141, 151 (2018) (quoting *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 140 (1985)). Whether a warning is adequate, and therefore whether a duty to warn has been breached, "is almost always an issue to be resolved by a jury," but may be decided as "a matter of law" if the manufacturer meets that standard. *MacDonald*, 394 Mass. at 140. To prevail, the plaintiff must also "establish that the lack of [a] warning caused [her] harm." *Reckis v. Johnson & Johnson*, 471 Mass. 272, 295 (2015).

Embraer contends that it is entitled to summary judgment on the failure to warn claims because Excellus cannot demonstrate that (1) it had a duty to warn about the dangers of recirculation fan failures, (2) its warning about fume events was inadequate, or (3) its failure to warn caused her injuries. Starting with duty, the parties dispute whether Embraer knew or should have known that recirculation fan failures on its planes are dangerous. In Embraer's telling, it had no duty to warn because the FAA certified its E-190 aircraft and no one ever reported an injury from a recirculation fan failure to Embraer. ECF 108, ¶¶ 99-100, 107. Anderson opines, however, that Embraer "knows and/or should know that recirculation fan failures can cause crew and passengers to be exposed to toxic electrical fumes in the cabin air." ECF 97-2, at 12-1, ¶ 4. And that opinion, as explained, rests on a reliable foundation—namely, her decades of relevant experience, her review of numerous publications on the hazards of such fumes, her determination

of the estimated service life of those fans, and her examination of pilot reports and service difficulty reports. *Id.* at 6-6, 11-1. Excellus also highlights pilot reports between 2009 and 2018 involving fetid fumes produced by recirculation fans. ECF 108, ¶ 76; *see* ECF 111-12. Some of those reports describe, for example, a "strong dirty sock smell" that "caused a light headed, odd feeling by [the] crew," prompting replacement of the recirculating fan, on May 24, 2011; a "smell in [the] cabin . . . something like kerosene or burning" on July 29, 2011; an "electrical smoke smell" coming from the recirculation fan vents in the cockpit on August 3, 2012; a "strong burnt rubber smell in [the] cabin & cockpit" on February 1, 2013; a "burnt smell odor . . . in [the] flight deck suspect[ed] from [a] recirc[ulation] fan" on February 7, 2013; a "smell of smoke in [the] cockpit" on February 25, 2014; an "acrid smell and visible smoke reported by [the] inflight crew" on August 2, 2014; a "strong electrical smell and smoke in [the] cockpit at the gate" on March 17, 2015; "'recirc[ulation] smoke' shortly after smelling an electrical odor" on March 31, 2016; and a "strong acrid smell perm[eating the] cabin on taxi out" on April 17, 2016, where the "recirc[ulation] fan" was found "to be [the] source." ECF 111-12 (capitalization omitted).[4] Viewed in the light most favorable to Excellus, a reasonable jury could find, based on this cumulative evidence, that Embraer knew or should have known that recirculation fan failures can cause toxic exposure events, and thus had a duty to warn crew members of the dangers of such failures. *See Schaeffer v. Gen. Motors Corp.*, 372 Mass. 171, 174 (1977) (trial evidence permitted "an inference that the defendant in the exercise of reasonable care should have foreseen and given warning of th[e] probable dangers" of its manufactured automotive part); *see also Geshke v. Crocs, Inc.*, 740

[4] Although not relevant to Embraer's prior awareness of recirculation fan failures, the spreadsheet of pilot-reported events also includes a report for Excellus' July 31, 2018 incident, which identifies a "strong adhesive smell in [the] cabin (recirculation fans)" and indicates that the left-hand recirculation fan was subsequently removed and replaced. ECF 108, ¶ 76.

F.3d 74, 78 (1st Cir. 2014) (assuming under Massachusetts law "that the determination of dangerousness can be for the jury" but "must rest on an adequate factual predicate").

Turning to breach, Embraer argues that it provided crew members with adequate warnings of the possible dangers associated with fume emissions and the steps crew members should take in fume emission events. Its airplane flight manual instructs crew members in the case of "SMOKE FIRE OR FUMES" to, among other tasks, "DON" "Crew Oxygen Masks." ECF 97-29, § 4-30, at 4. This instruction is described as a "recall ite[m]" that "must be performed expeditiously and from memory." ECF 108, ¶ 113. Embraer's flight attendant manual also explains where to find and how to use emergency equipment, including oxygen and Personal Breathing Equipment. *Id.* ¶ 114. Such equipment, the manual adds, "is designed to safeguard the wearer from effects of smoke, carbon dioxide, harmful gases and oxygen deficiency, while managing *in-flight* fire, smoke or fume emergencies." *Id.* (bold omitted).

Neither manual, however, defines a "fume" event, details how to respond to such an event beyond donning a mask, or offers instructions about what to do if that event were to occur *before* takeoff. The manuals fail to address what to do when a plane is at the gate and thus do not, for example, instruct crew members to leave the aircraft. Nor do the manuals even mention, let alone fairly convey, "the nature and extent of the danger" of recirculation fan failures. *Rafferty*, 479 Mass. at 151 (quotation marks omitted). Embraer retorts that the source of the fumes is irrelevant; what matters is how to respond to a fume event. But Anderson opines that Embraer should have provided "educational materials and standard procedures for crewmembers to recognize and respond to different types of onboard fumes and smoke" in addition to "the basic smoke/fire procedures." ECF 97-2, at 6-10. Embraer also argues that, in light of the manual's instruction to

"land at the nearest airport," it is common sense for crew members to get off the plane when grounded. ECF 108, ¶ 111. Whether that is true is a question of fact for the jury.

A material factual dispute therefore remains regarding the adequacy of Embraer's warning. It cannot be said that, "[a]s a matter of law," Embraer's existing manuals "adequately warned" Excellus about the dangers of recirculation fan failures and how to respond to those failures "in terms understandable to a lay person." *Niedner v. Ortho-McNeil Pharm., Inc.*, 90 Mass. App. Ct. 306, 312 (2016) (affirming grant of summary judgment for defendants where "the warnings were plain, numerous, and comprehensive"). Indeed, whether a particular warning is sufficient "is almost always an issue to be resolved by a jury" because "few questions are more appropriately left to a common sense lay judgment than that of whether a written warning gets its message across to an average person." *Rafferty*, 479 Mass. at 151-52 (quotation marks omitted); *see Penn-Am. Ins. Co. v. Bay State Gas Co.*, 96 Mass. App. Ct. 757, 762 (2019) ("Whether the content and the manner of distribution of [the defendant's] warnings were sufficient are jury questions."). This case is no exception.

With respect to causation, Excellus must show that Embraer's failure to provide an adequate warning about recirculation fan failures "'proximately result[ed] in [her] injuries.'" *Reckis*, 471 Mass. at 295 (quoting *Laaperi v. Sears, Roebuck & Co.*, 787 F.2d 726, 729 (1st Cir. 1986)). She may do so "through evidence indicating that if additional 'warnings had been given and heeded, the outcome would have been different.'" *Id.* (quoting *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998), *aff'd*, 183 F.3d 67 (1st Cir. 1999)). Proximate "causation is generally left to a jury to decide" unless, as a matter of law, it cannot be proven. *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 44 (2009).

Massachusetts "'law permits an inference that a warning, once given, would have been followed.'" *Evans*, 465 Mass. at 442 (quoting *Harlow v. Chin*, 405 Mass. 697, 702-03 (1989)). In her expert report, Anderson opines that crewmembers should have been trained with standard procedures and educational materials "to recognize and respond to different types of onboard fumes and smoke." ECF 97-2, at 6-10, 10-1, 10-5. Because there exists a triable issue over whether this "warning should have been given, the burden is on '[Embraer] to come forward with evidence tending to rebut such an inference.'" *Evans*, 465 Mass. at 442 (quoting *Wolfe v. Ford Motor Co.*, 6 Mass. App. Ct. 346, 352 (1978)). Attempting to rebut the inference that Anderson's recommended warning "would have alerted [Excellus] to the danger and forestalled the accident," Embraer points to evidence that she was trained on fume events and failed to heed the warning in its flight manual to don a mask in such a situation. *Wolfe*, 6 Mass. App. Ct. at 352.

But again, neither her training nor that warning detailed the dangers of recirculation fan failures specifically, how to identify and address different fumes in the cabin, or how to address recirculation fan failures that occurred at the gate, rather than mid-flight. Excellus also testified that she was given training materials on "fume events" but not "aerotoxicity." ECF 97-5, at 120:10-20. According to Anderson, "a fume event . . . is a term to art to describe the presence of oil or hydraulic fluid in the air supply system," but what Excellus experienced was "very differen[t]" because the cabin "didn't smell like oil or hydraulic fumes, and so . . . she didn't know what to do." ECF 97-18, at 152:1-19. Indeed, Excellus testified that because it was "a different smell than what [they] usually smell[ed] or" were "accustomed to," she told her coworker in July 2018 that she "'hope[d] it [would not] get [them] sick.'" ECF 97-5, at 82:6-11. She also described the "dirty sock smell" as a "completely different" odor that she had "never smelled . . . before on a[n] aircraft" and explained that her colleagues at the time did not know what the smell was either. *Id.* at 85:5-

25; *see id.* at 87:18-19. Excellus left the plane after informing her coworkers that she was feeling sick and "'didn't know what that smell'" was. *Id.* at 86:10-87:6.

In light of this evidence, there exists a triable issue on whether Embraer's failure to provide more robust warnings caused Excellus' injuries. Embraer has not established, as a matter of law, that Excellus would not have heeded Anderson's recommended warning simply because she failed to follow Embraer's instruction about putting on a mask. *See Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 376 (1st Cir. 2009) (applying Massachusetts law in vacating grant of summary judgment where it could not be concluded "that a warning about the danger posed by polishing or occupational exposures to beryllium . . . would have gone unheeded"). A reasonable jury could conclude that Excellus did not deliberately disobey Embraer's manual when she failed to don a mask during the July 2018 incident; instead, that jury could conclude that Excellus failed to use a mask because she, like her fellow crew members, did not recognize the cabin's odor.

The trier of fact could also reasonably conclude that had Excellus been instructed on identifying different smells and their dangers, as well as how to respond to those smells, before the July 2018 incident, she would have known how to react to the odors onboard—by, for example, putting on a mask, using other protective equipment, or exiting the aircraft—and avoided or diminished her injuries. *See Evans*, 465 Mass. at 443 (finding insufficient evidence to rebut presumption that had plaintiff "received adequate warning before she started smoking, she would have heeded the warning and avoided the addiction"); *Laaperi*, 787 F.2d at 730, 732-33 (affirming denial of motion for judgment notwithstanding the verdict where the jury could have concluded that plaintiff "would have instituted different fire detection methods" to "minimize[e] the danger that a fire-causing short circuit would render the detector inoperative" "had he been properly warned" of such a danger); *LaBelle v. McCauley Indus. Corp.*, 649 F.2d 46, 49 (1st Cir. 1981)

(same because whether a revised manual "adequately warned" plaintiffs "was a question of fact"). The factfinder would be free to credit the testimony of Anderson and Excellus regarding the type of warning that was, or should have been, provided.

Finally, there exists a triable dispute over whether the fumes emitted from the failed recirculation fan were the cause of Excellus' medical symptoms. Dr. Howard opines that Excellus had "an acute exposure to carbon monoxide" and "a mixture of volatile organic compounds of unknown composition" when "a recirculation fan malfunctioned on the aircraft she was working on." ECF 97-15, at 350-53. The exposure to these substances, he explains, caused an elevated carboxyhemoglobin level in Excellus' blood. *Id.* 420-22. And "the acute and chronic symptoms that Ms. Excellus has described," he continues, "are consistent with the carbon monoxide poisoning under consideration in this case and are the cause of her current medical condition." *Id.* at 436-38. Dr. Kaniecki and Dr. Harrison further opine that Excellus' medical symptoms were caused by an aerosolized toxin or volatile organic compounds with carbon monoxide. ECF 108, ¶¶ 34-35, 38. If it credited this testimony, a reasonable trier of fact could find a causal nexus between the recirculation fan failure and Excellus' chronic migraines, blurred vision, cognitive challenges, sensitivity to light, and struggles with balance. *See Reckis*, 471 Mass. at 292 ("[E]xpert testimony is required to establish medical causation."). Accordingly, a genuine dispute of material fact remains as to whether an additional or alternative warning would have prevented Excellus' injuries, and Embraer's motion for summary judgment must be denied.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, the motion for summary judgment, ECF 95, is GRANTED in part and DENIED in part. Summary judgment will enter for Embraer Aircraft Customer Services, LLC and Embraer Customer Services, Inc. on Counts III, IV, V, and VI of the complaint, but not

for Embraer, S.A. on Counts I and II of the complaint. The motion to exclude the expert testimony of Drs. Harrison, Kaniecki, and Howard, ECF 99, is DENIED. And the motion to exclude the expert testimony of Anderson, ECF 98, is GRANTED in part and DENIED in part. Anderson may testify that Embraer could have anticipated, but failed to adequately warn crew members about, the dangers of the recirculation fan failures, but she may not testify about any alleged design deficiencies or proposed alternative designs of the E-190 aircraft.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 23, 2026